IN THE CIRCUIT COURT
EIGHTH JUDICIAL CIRCUIT IN AND
FOR BAKER COUNTY, FLORIDA

3:04-CV-422-J-16 TEM

JACK BLINCO, JR., and DEBORAH BLINCO,
on behalf of Themselves and others
similarly situated,

CASE NO. 02-2004-CA-0060

Plaintiff,

CLASS REPRESENTATION

vs.

**FILED**

GREEN TREE INVESTMENT HOLDINGS, LLC
f/k/a CFN INVESTMENT HOLDINGS LLC
Defendant,

APR 23 2004

CLERK CIRCUIT COURT
BAKER COUNTY FLO___

## COMPLAINT

Jack Blinco, Jr., and Deborah Blinco (collectively: Blinco) sue Green Tree Investment Holdings LLC f/k/a CFN Investment Holdings LLC (Green Tree Investment) and state:

### JURISDICTION/VENUE

1. This is a class action brought by Blinco against Green Tree Investment. Aggregate class damages exceed $100,000.00. This action arises out of the common failure of Green Tree Investment to service federally related mortgage loans as required by the Real Estate Settlement Procedures Act *12 U.S.C. §2601 et seq.*

2. This Court also has jurisdiction pursuant to 12 U.S.C. §2614 which provides that an action for violation of 12 U.S.C. §2605 may be brought in a court of competent jurisdiction in the District in which the property involved is located, or where the violation is alleged to have occurred.

3. Venue is appropriate in Baker County. This action arises out of a mortgage encumbering property owned by the Blincos located in Baker County. The Blincos are residents of Baker County.

1



## CLASS REPRESENTATION ALLEGATIONS

### (A) COMMON QUESTIONS OF LAW

4. The Real Estate Settlement Procedures Act (RESPA) *12 U.S.C. §2601 et seq* establishes uniform standards required of entities who service federally related mortgage loans. In enacting the RESPA, Congress made the following findings and purpose at 12 U.S.C. §2601:

> (a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. The Congress also finds that it has been over two years since the Secretary of Housing and Urban Development and the Administrator of Veterans' Affairs submitted their joint report to the Congress on "Mortgage Settlement Costs" and that the time has come for the recommendations for Federal legislative action made in that report to be implemented.
>
> * * *
>
> (b) It is the purpose of this Act to effect certain changes in the settlement process for residential real estate that will result—
>
> (3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and

2

(4) in significant reform and modernization of local record keeping of land title information.

5. In enacting RESPA, Congress established certain definitions that are applicable in this case as stated at *12 U.S.C. §2602*:

Definitions:

For purposes of this Act—

(1) the term "federally related mortgage loan" includes any loan (other than temporary financing such as a construction loan) which—

(A) is secured by a first or subordinate lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property; and

(B) (I) is made in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or is made in whole or in part by any lender which is regulated by any agency of the Federal Government; or

(ii) is made in whole or in part, or insured, guaranteed, supplemented, or assisted in any way, by the Secretary or any other officer or agency of the Federal Government or under or in connection with a housing or urban development program administered by the Secretary or a housing or related program administered by any other such officer or agency; or

3

(iii) is intended to be sold by the originating lender to the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, or a financial institution from which it is to be purchased by the Federal Home Loan Mortgage Corporation; or

(iv) is made in whole or in part by any "creditor", as defined in section 103(f) of the Consumer Credit Protection Act [15 U.S.C.§1602(f)], who makes or invests in residential real estate loans aggregating more than $ 1,000,000 per year, except that for the purpose of this Act, the term "creditor" does not include any agency or instrumentality of any State

* * *

6. And at *12 U.S.C. §2605(I)(3)*, Congress also defined servicing as follows:

(3) Servicing. The term "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 10, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

7. A servicer was defined as the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan). *12 U.S.C. §2605(I)(2)*.

8. A servicer who services a federally related mortgage loan is required by RESPA to perform certain notice activities when the servicer either: (a) transfers the loan to another servicer; or (b) becomes a transferee of a federally related mortgage loan. Both the servicing transferor and the servicing transferee of a federally related mortgage loan are required to

4

notify the mortgage obligor of the transfer and provide specific factual information to the mortgagee within a specified period of time after the transfer. The servicing transferor's and the servicing transferee's duties are defined at 12 U.S.C. §2605(c) as follows:

(c) Notice by transferee or loan servicing at time of transfer.

(1) Notice requirement. Each transferee servicer to whom the servicing of a federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer.

(2) Time of notice.

(A) In general, except as provided in subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

(B) Exception for certain proceedings. The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by—

(I) termination of the contract for servicing the loan for cause;

(ii) commencement of proceedings for bankruptcy of the servicer; or

(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship

5

or receivership of the servicer (or an entity by which the servicer is owned or controlled).

* * *

9. The contents of the notice required of the transferee/transferor, are specified at 12 U.S.C. §2605(b)(c) as follows:

> (A) The effective date of transfer of the servicing described in such paragraph.
>
> (B) The name, address, and toll-free or collect call telephone number of the transferee servicer.
>
> (C) A toll-free or collect call telephone number for (I) an individual employed by the transferor servicer, or (ii) the department of the transferor servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.
>
> (D) The name and toll-free or collect call telephone number for (I) an individual employed by the transferee servicer, or (ii) the department of the transferee servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.
>
> (E) The date on which the transferor servicer who is servicing the mortgage loan before the assignment, sale, or transfer will cease to accept payments relating to the loan and the date on which the transferee servicer will begin to accept such payments.
>
> (F) Any information concerning the effect the transfer may have, if any, on the terms of or the continued availability of mortgage life or disability insurance or an other type of optional insurance and what action, if any, the borrower must take to maintain coverage.

      (G) A statement that the assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the security instruments other than terms directly related to the servicing of such loan.

10. The term "effective date of transfer" means the date on which the mortgage payment of a borrower is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale or transfer of the servicing of the mortgage loan 12 U.S.C. §2605(I).

11. Therefore, a transferee and transferor/servicer (such as Green Tree Investment) is supposed to give to the federally related mortgagee: (a) a notice of transfer; (b) generally within 15 days from the effective date of transfer; (c) statutory information 12 U.S.C. §2605(b)(c).

### (B) COMMON ALLEGATIONS OF FACT (SECURITIZATION)

12. Prior to November 17, 1999, Conseco, Inc. and its subsidiary Conseco Finance Servicing Corp. were engaged in the business of originating and financing retail purchases of mobile homes by consumers. In return for advancing the purchase money funds, Conseco, Inc. and its subsidiary would receive from the consumers purchase money mortgages and notes encumbering both the mobile home and the real property owned by the consumers on which the mobile home was to be situated as a consumer residence.

13. In order to obtain a continual flow of cash in order to fund the consumer purchase money retail loan, Conseco, Inc. and its subsidiary would engage in a process called securitization.

14. Through the securitization process, Conseco, Inc. and/or its subsidiary would:
    (a) sell or transfer to an independent trustee and/or a third party entity groups of consumer mortgages and notes;

7

(b) In return, the independent trustee and/or third party would issue promissory notes or bonds to third party investors who would pay monies to the trustee and/or the independent third party for the purchase of the notes;

(c) the notes sold by the trustee and/or independent third party were collateralized by the consumer mortgages and promissory notes that had been transferred from Conseco, Inc. and its subsidiary to the trustee and/or third party;

(d) the trustee and/or independent third party would receive the note purchase monies from the investors and pass the note purchase monies through to Conseco and/or its subsidiary.

In other words, the securitization process involved Conseco obtaining money from bond or note holders through the securitization process at a lower rate of interest (5/6%) and re-lending the monies to mobile home retail purchasers at a higher rate of interest (13%).

15. As part of its normal securitization process, Conseco Financial Corp., f/k/a Green Tree Servicing Corp., Conseco Finance Servicing Corp. and/or Conseco, Inc. would assign the consumer notes and mortgages to banking associations as trustees. The assignments would include the wording that the assignment to the bank/trustee would include "all monies now owing or that may hereafter become due or owing under the terms of the mortgage and note together with the full beneficial of all powers and all of the covenants and provisions contained the assigned mortgage and note."

16. As part of the securitization process, Conseco, Inc. and/or its subsidiary would file a prospectus with the Securities and Exchange Commission. A typical prospectus would offer approximately $1,000,000,000.00 of manufactured housing/manufactured housing and land contracts to the trustee or third party in order to form an asset pool for the issuance of approximately $105,000,000.00 worth of certificates or notes for sale to third party investors.

8

17. As part of its securitization process, Conseco, Inc. and/or its subsidiary would advise in the securitization process that Conseco, Inc. and/or its subsidiary would not amend a certificate of title on a manufactured home to name the trustee as a lien holder or note the trustee's interest on the certificate of title. Furthermore, Conseco, Inc. and/or its subsidiary would also note that Conseco, Inc. and/or its subsidiary would not record the assignment to the trustee of any accompanying mortgage or deed of trust securing the land-and-home contracts because of the expense and administrative inconvenience involved. However, Conseco, Inc. would always note in the SEC prospectus supplement that "we intend each transfer of contract by Conseco to constitute a sale rather than a pledge." Therefore, as part of the securitization process, Conseco, Inc. sold the consumer mortgage and notes to the third party trustee or other independent third party.

18. However, by separate agreement, Conseco, Inc. retained the servicing rights in the notes and mortgages that had been assigned to the trustee/third party. Consequently, Conseco, Inc. would continue to collect the monies from the retail consumer/borrowers and pass those monies through to the securitization trustee/third party after Conseco, Inc. deducted a servicing fee.

### (C) GENERAL ALLEGATIONS CONSECO BANKRUPTCY SALE/SALE OF SERVICING RIGHTS

19. Eventually, Conseco, Inc. and Conseco Finance Servicing Corp., together with other Conseco affiliates, filed for Chapter 11 bankruptcy reorganization in the United States Bankruptcy Court, Northern District of Illinois, on December 17, 2002 (In Re: Conseco Finance Servicing Corp. #02-49676 Bankrtcy N.D.Ill)[1].

---

[1] Access to the Conseco Finance Servicing Corp and the Conseco, Inc. and CIHC, Inc. Chapter 11 cases may be found by viewing the CM/ECF System (PACER) of the United States Bankruptcy Court, Northern District of Illinois. On December 18, 2002, the Bankruptcy Court Northern District of Illinois entered an Order in the Conseco, Inc. case (Docket No. 102) consolidating the Conseco cases for procedural purposes and for the joint administration in

9

20. On March 14, 2003, the United States Bankruptcy Court, Northern District of Illinois, Eastern Division, entered an Order in the Conseco, Inc., case authorizing the sale of the Conseco, Inc. assets to CFN Investment Holdings, LLC (CFN).

21. The Bankruptcy Court's Order also attached the previously executed purchase and sale agreement between the Conseco, Inc. and CFN.

22. According to the Bankruptcy Court's Order, the CFN purchase of the Conseco Inc.'s assets was an arms-length transaction between the two separate entities which resulted in a complete divestment and transfer of the Conseco Inc.'s assets (from the Conseco entities) to CFN. As the Bankruptcy Court ordered with respect to the transfer of the Conseco Inc. assets CFC (debtor) to CFN (buyer):

\* \* \*

> The CFC debtor[2] may sell the purchased assets free and clear of all interests . . . (Order at p 5)

\* \* \*

> The buyer is a good faith purchaser under Section 363(m) and, as such, is entitled to all protections afforded thereby (Order at p 7).

\* \* \*

> Neither the buyers nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the purchased assets: (a) is a successor to the CFC debtors; (b) has de facto or otherwise merged with or into the CFC debtors; or (c) is a continuation or a substantial continuation of the CFC debtors or any enterprise of the CFC debtors (Order at p 8).

\* \* \*

---

accordance with Rule 1015 of the Federal Rules of Bankruptcy Proceeding. The Docket entries for both cases were consolidated into the main Conseco case (In Re: Conseco, Inc. No. 02-49676 (Banktcy N.D.Ill). **For this reason, Conseco, Inc. and its subsidiaries will be referred to simply as Conseco, Inc.**

[2]The "CFN debtor" means Conseco, Inc., Conseco Finance Corp., Conseco Finance Servicing Corp., Conseco Finance Credit Corp., and other wholly owned affiliates of Conseco, Inc.

10

> The buyer (or appropriate affiliate) is distinct from and independent of any CFC party and in conformity with all of the servicing contracts included among the purchased assets (Order at p 8).
>
> * * *
>
> ... The purchased assets will be transferred to the buyer as of the closing date, shall be free and clear of: (a) all interests; and (b) all debts arising under, relating to, or in connection with any acts of the CFC debtors ... (Order at p 11)
>
> All persons and entities ... holding interest or claims of any kind or nature or whatever against the CFC debtors or in the purchased assets ... shall be forever barred, stopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the buyer, its property, its successors and assigns, its affiliates or the purchased assets ... interests or claims (Order at p 12).
>
> * * *
>
> The transfer of the purchased assets to the buyer pursuant to the purchase agreement constitutes a legal, valid and affective transfer of the purchased assets and shall vest the buyer with all right, title and interest of the CFC debtors in and to the purchased assets free and clear of all claims and interests of any kind or nature whatsoever (Order at p 14).
>
> Each non-debtor party to an assumed agreement is forever barred, stopped and permanently enjoined from asserting against the buyer or its property or affiliates any breach or default under any assumed agreement, any claim of lack of consent or any other condition to the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other claim asserted or assertable against the CFC debtor ... (Order at p 18)

In other words, the order provided for a transfer of the servicing rights of the separate-entity purchaser (CFN).

23. And in the agreement itself, the Conseco entities also expressly agreed with CFN that CFN would not be a successor to the Conseco entities; nor would CFN be deemed to have *de facto* or otherwise merged with the Conseco entities; nor would CFN be deemed a continuation or substantial continuation of any of the Conseco sellers.

11

## ASSET PURCHASE AGREEMENT

This Amended and restated Asset Purchase Agreement... is made as of March 14, 2003 by and among Conseco Finance Corp.... and CFN Investment Holdings, LLC a Delaware Limited Liability Company (the "buyer")

### DEFINITIONS

"Purchased assets" means assets, properties, contracts owned or primarily used or held for use in the operation of the purchased business... including, without limitation (a) all servicing rights; (b) ... (c) all other assets ... (g) the servicing assets, (h) the servicing contract to the limited extent the buyer will act as servicer or successor servicer thereunder (Agreement at p 20)

24. The term "MH servicing assets" is defined in the purchase/sale agreement

> "MH servicing assets" means: (a) the rights of the servicer under the MH servicing contracts; (b) with respect to each loan and securitized loan subject to an MH servicing contract, the escrow payments ... and any amounts actually collected and held by the CFC parties with respect thereto; (c) all accounts and other rights to payments, documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the servicing of each loan or pertaining to the past, present, or perspective servicing of such loan, in each case that is subject to an MH servicing contract. (Agreement at p 15
>
> * * *
>
> "MH Servicing Rights" means the right to act as servicer or successor servicer or successor servicer under each MH Servicing Contracts and all rights, privileges and benefits of being servicer or successor servicer under each MH Servicing Contract or that are incidental thereto (but not including any rights included in the Insurance Business) including without limitation any and all of the following: (a) any and all rights to service such Loan or any Securitized Loan; (b) all servicing fees and other fees, compensation or monies payable to the servicer under the MH Servicing Contracts and (c) any late fees, investment income or similar payments or penalties (including, without limitation, prepayment penalties) with respect to such Loan or Securitized Loan payable to the servicer under the Servicing Contracts. (Agreement at p 16)
>
> ... providing that neither the Buyer nor its affiliates, successors or assigns will be deemed as a result of any action taken in connection with the purchase of the purchased assets to: ( I) be a successor to

12

any of the Sellers; (ii) have, de facto, or otherwise, merged with or into any of the Sellers; or (iii) be a continuation or substantial continuation of any of the Sellers or any enterprise of any of the Sellers . . . (Agreement at p 22)

* * *

25. In addition, the agreement itself provided for a specific transfer of servicing rights:

> The buyer (CFN) shall be the servicer or successor servicer with respect to all MH servicing rights under each MH servicing contract and the buyer shall be recognized as the servicer or successor servicer with respect to all MH servicing rights under each MH servicing contract, any servicing fees shall be senior in the cash flow waterfall with respect to the securitization covered by such MH servicing contracts . . . (Agreement at p 89)

Therefore, only CFN purchased the mobile home servicing assets from the Conseco entities at a bona fide purchase transaction through a Bankruptcy Court Order which expressly defined the Conseco Bankrupt entities and the CFN purchasing entities as separate and apart. The Purchase and Sale Agreement demonstrated that CFN was the new transferee of the Blinco servicing rights.

26. Consequently, CFN purchased the servicing assets of Conseco, Inc. and its subsidiaries at an arms length transaction in which CFN was not a continuation of Conseco or its subsidiaries.

27. Subsequently, CFN Investment Holdings, LLC changed its name to Green Tree Investment Holdings, LLC.

28. Green Tree Investments in its capacity as designated successor servicer received or was entitled to receive scheduled periodic payments from the class membership as required pursuant to the terms of the various loan obligations from the individual class members. As specifically designated servicer/successor transferee, Green Tree Investment violated 12 U.S.C.§2605(c) by failing to give to the class membership the transferee notice and information required by that section within the time mandated by that section became the servicer of the mortgages/notes that are the subject of this class action. Green Tree

13

28. Investments, in its capacity as holder or servicer received scheduled periodic payments from the class membership, and other payments from the class membership as required pursuant to the terms of the various loan obligations from individual class members. As servicer/transferee, Green Tree Investment violated 12 U.S.C.§2605(c) by failing to give to the class membership the notice and information required by that Section within the time mandated by that Section.

29. Subsequently, Green Tree Investments transferred servicing of the class membership mobile home accounts to Green Tree Servicing, LLC. As transferor, Green Tree Investment violated 12 U.S.C. §2605(b) by failing to give to the class membership the notice and information required of a transferor by that section within the time mandated by that Section.

### (D) TYPICALITY

30. The claims of Blinco are typical of the claims of the class membership.

31. On or about November 17, 1999, Blinco executed and delivered a note and mortgage to Green Tree Financial Servicing Corp. in the amount of $49,982.90 for the purchase of real property described in the mortgage.

32. The mortgage given by Blinco to Green Tree Financial Servicing Corp. was acknowledged by Green Tree Financial Servicing in the servicing disclosure statement as a: "mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. §2601 et seq) you have certain rights under that federal law."

33. In reality, the mortgage executed by Blinco in favor of Green Tree Servicing Corp. was at all times pertinent a federally related mortgage loan as defined in 12 U.S.C. §2602(1).

34. On July 18, 2000, Conseco Financial Corp., f/k/a Green Tree Servicing Corp., assigned the Blinco note and mortgage to U.S. Bank, National Association. The assignment also

14

included the assignment to U.S. Bank of "all monies now owing or that may hereafter become due or owing in respect thereof, and *the full benefit of all the powers and of all of the covenants and provisions as therein contained*"(emphasis supplied) together with the assignors' beneficial interest under the mortgage. The assignment was obviously for the purpose of securitization because the return stamp on the recording notation was designated as "U.S. Bank Corporate Trust Svc." with the pool being designated as "land".

35. Conseco Finance Servicing Corp. was a subsidiary of Conseco, Inc. Conseco, Inc. subsequently filed for protection under Chapter 11 of the United States Bankruptcy Code. Conseco Finance Servicing Corp. became an asset of Conseco, Inc.'s assets in the Chapter 11 Reorganization. Therefore, the servicing rights on the Blinco note and mortgage became an asset of the Conseco, Inc. Chapter 11 Reorganization.

36. As previously stated, CFN Investment Holdings, LLC purchased from Conseco, Inc. the servicing rights to the Blinco note and mortgage as part of the previously specified asset purchase agreement wherein CFN Investment Holdings, LLC purchsed the mobile home servicing rights from Conseco, Inc.

37. With respect to the Blinco mortgage, CFN Investment Holdings, LLC became the transferee/servicer as defined in 12 U.S.C. §2605.

38. At an indeterminate time, CFN Holdings, LLC changed its name to Green Tree Investment Holdings, LLC.

39. Subsequently, CFN Investment Holdings, LLC transferred the servicing rights to the Blinco mortgage to an entity known as Green Tree Servicing, LLC.

40. Green Tree Investment as transferee from Conseco, Inc. did not furnish to Blinco the transferee notice required under 12 U.S.C.§2605(c). Green Tree Investment as transferor to Green Tree Servicing, LLC did not furnish to Blinco the transferor notice as required by 12 U.S.C.§2605(c).

15

### (E) GREEN TREE INVESTMENT AS DESIGNATED SUCCESSOR/SERVICER WAS RESPONSIBLE FOR SERVICING FEDERALLY RELATED MORTGAGE LOANS THAT ARE SIMILAR

41. Green Tree Investment serviced federally related mortgage loans, that are similar to Blinco's, throughout the state of Florida. Blinco estimates that the number of federally related mortgage loans, that are similar to Blinco's, serviced by Green Tree Investment exceeds one thousand (1,000) in number. Joinder would be impossible or impractical because of the geographic disbursion of class members. Judicial economy would be served through the ease of identifying the class members and their addresses from the records of Green Tree Investment.

### (F) REPRESENTATION

42. Blinco has selected the services of Mickler as Plaintiff's attorney. Mickler is qualified, experienced in class actions and will competently and vigorously prosecute this litigation. The interests of Blinco, as putative class representative are not antagonistic to or in conflict with other members of the class. Blinco seeks the same remedies, through the same legal theories, as are applicable to all class members.

### (G) CLASS DEFINITION

43. The membership of this putative class is as follows:

> (a) All mortgagees, located in the state of Florida, whose federally related mortgages were transferred to Green Tree Investment and who did not timely receive the transferee/transferor servicer notice and information required by 12 U.S.C. §2605(c) since the effective date of the transfer to Green Tree Investment.

16

## (H) RULE 1.220(b)(3) STATEMENT

44. Blincos are electing to proceed under Fla.R.Civ.Pro. 1.220(b)(3) (predominance).

45. The questions of law and fact are common to the claim of the representative party and the class membership. In addition, any questions of law and fact that are applicable as a defense to Green Tree Investment would be common as a defense both to Blinco and the class membership. Specifically, the claims of the class membership and Blinco involve the uniform failure of Green Tree Investment to give the required transferee/servicer and transferor/servicer 12 U.S.C. §2605(c) notification and information to the class membership.

46. Blinco is not aware of any pending litigation involving the issues of fact and law similar to this class action.

47. It is desirable to concentrate the claims of all class members and Blinco in one single class action. The similarity of legal issues and factual issues can be resolved in one unified class-wide adjudication by this class action. Individual class members may not have knowledge of their individual RESPA rights and may not have the financial ability to pursue an individual claim against Greentree.

48. Blinco knows of no difficulty likely to be encountered in the management of the claims or defenses on behalf of this class. Class membership can be determined through the records of Green Tree Investment. Class-wide factual information can also be determined through the records of Green Tree Investment. In addition, with certain exceptions, statutory class damages are identical to each class member.

## (I) DAMAGES

49. 12 U.S.C. §2605(f) provides that a transferee/transferor who fails to comply with the transferee/transferor notification requirements is liable for: (a) actual damages suffered by the borrower as a result of the failure of transferee/servicer notification; (b) in the case of

17

a pattern of non-compliance, statutory damages in an amount not to exceed $1,000.00 to each member of the class except that the total amount of damages in a class action may not exceed the lesser of: (a) $500,000.00; or (b) 1% of the net worth of the servicer.

### (J) COSTS AND REASONABLE ATTORNEY'S FEES

50. For the purposes hereof, Blinco and each class member is entitled to statutory damages in the amount of $1,000.00 because of the pattern of non-compliance by Green Tree Investment together with an award of attorney's fees and costs related to this class action. In certain circumstances, individual class members may be entitled to actual damages.

51. Accordingly, Blinco requests that this Court: (a) enter an order determining that this action is maintainable as a class; (b) a judgment determining that Green Tree Investment violated the applicable provisions of RESPA; (c) an award of statutory and (in certain cases) actual damages; (d) costs and attorney's fees.

DATED this 23rd day of April, 2004, in Jacksonville, Florida.

_____
ALBERT H. MICKLER
Attorney for Plaintiffs
5452 Arlington Expressway
Jacksonville, Florida 32211
(904) 725-0822
Fax (904) 725-0855
Florida Bar No. 168960

18